UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SEA KING CORPORATION, and
HOP HING HONG,

       Plaintiffs,

v.

                                   Civil No. 2:17cv528

EIMSKIP LOGISTICS, INC.,
CMA CGM (AMERICA), LLC, and
CMA CGM, S.A.,

       Defendants and Third-
       Party Plaintiffs,

v.

MARINE REPAIR SERVICES OF VIRGINIA, INC.,
LEIGHTON TRUCKING, LLC, and
VIRGINIA INTERNAITONAL TERMINALS, LLC,

       Third-Party Defendants.


## OPINION and ORDER

This maritime matter is before the Court following a bench trial, and involves a contract dispute between third-party plaintiff CMA CGM, S.A. ("CMA") and third-party defendant Marine Repair Services of Virginia ("MRS"). Although a trial was necessary in this case, the majority of the facts are not in dispute, and the primary legal issue is whether CMA is entitled to complete indemnity from MRS pursuant to the "warranty of workmanlike performance" that has been recognized in this Circuit

to apply in maritime stevedoring contracts, ship repair contracts, and at least some towage contracts.

## I. Findings of Fact

### A. Stipulated Facts

The Court adopts, and incorporates herein by reference, the forty-five stipulations of fact set forth in the final pretrial order. ECF No. 94, at 3-13. Reproduced immediately below is an abbreviated version of such stipulations.[1]

CMA is a French ocean carrier with its headquarters in France, and CMA conducts business in the United States through its agent, CMA CGM (America), LLC ("CMA America"). MRS is a Virginia corporation that, among other things, maintains and services refrigerated cargo containers ("reefers") at various terminals in the Port of Virginia.

In October of 2016, plaintiff Sea King Corporation ("Sea King") contacted defendant Eimskip Logistics Inc. ("Eimskip") to arrange for the transport of a cargo of frozen conch meat from Sea King's facility in Atlantic, Virginia to Hong Kong. On October 14, 2016, Eimskip made a "web booking" for such shipment with CMA America. Such booking indicated that the cargo was "frozen seafood" to be shipped from Virginia International Gateway

---

[1] The footnotes in this section do not reflect stipulations but are instead clarifications offered by the Court based on the findings it makes as factfinder.

terminal ("VIG") to Hong Kong, in a refrigerated container set at -20° Celsius, vents closed. CMA[2] sent Eimskip a booking confirmation reflecting such shipping requirements, and Eimskip sent a follow up email to Sea King confirming the booking for shipment through CMA. After Sea King was paid in full for the cargo by the Hong Kong buyer, it executed a written contract with Eimskip for shipment of the frozen conch meat (valued at over $250,000) to Hong Kong in a 40-foot reefer set to an internal temperature of -20° Celsius. Sea King paid Eimskip approximately $5,500 for ocean freight, pre-carriage transport, and insurance.

Virginia International Terminals ("VIT"), the entity that operates the VIG terminal, has an "electronic data interface" ("EDI") system that permitted CMA to electronically forward the electronic booking made by Eimskip to the terminal. However, VIT had an EDI server issue beginning on October 25, 2016 that delayed certain booking entries from posting in the system until late on October 27, 2016.

As a result of the booking with Eimskip, CMA sent an email order to MRS requesting that MRS prepare a reefer for release, listing the required preset temperature as -20° Celsius. A reefer is an insulated container with a refrigeration unit powered either

---

[2] It is undisputed that CMA America is an agent for CMA, and from this point forward, consistent with the parties' treatment of these entities in the stipulations, the Court refers to them collectively as CMA.

by an external source (plugged into shore or ship power) or by a portable generator attached to the container (commonly known as a "genset"). A genset is attached to a reefer when it is being transported by truck, and the genset is generally removed when the reefer is stored at a facility that has power or when it is loaded onto a ship. A reefer container is readily distinguishable from a standard cargo container because reefers have smooth sides and dry cargo containers have corrugated sides.

Based on CMA's email request, MRS "pre-tripped" reefer Container No. TRIU8137918 (the "Container"), which was leased by CMA and stored at MRS's "depot" in Chesapeake, Virginia. The pre-trip inspection, performed by MRS in Chesapeake, confirmed that the Container's refrigeration system was operating properly.

As of October 2016, CMA and MRS had a general course of dealing under which MRS agreed to: (1) pre-trip CMA's containers as needed; and (2) monitor CMA's export container temperatures twice per day after a live container with temperature requirements was in-gated at the VIG terminal. The purpose of the monitoring was to confirm that the temperature stayed within a designated range and to protect the integrity of the cargo. As a matter of practice, when MRS identifies a discrepancy between the booking temperature and the actual temperature of a reefer, it immediately notifies the ship line (here CMA) as a failsafe against cargo damage.

On October 26, 2016, third-party defendant Leighton Trucking, LLC ("Leighton"), a company hired by Eimskip to transport the empty pre-tripped Container from MRS's Chesapeake facility to Sea King's facility for loading, and then transport the loaded Container to VIG, picked up the Container in Chesapeake. On the morning of October 27, 2016, Leighton brought the Container to Sea King's facility, and the properly functioning reefer was loaded with frozen conch meat and sealed.

That same morning, Eimskip contacted CMA to inform it that the Container was actively being loaded, but that there was not a booking for such reefer in VIT's computer system (a fact that resulted from the EDI server issue). In response to this email, a CMA employee manually input the booking data into VIT's system, and although such booking identified the Container as a loaded reefer for export, it failed to reflect a temperature requirement for the Container.

VIG is an automated terminal that minimizes personal contact with containers moving through the terminal facility. The gate-in process is handled remotely, with inspection of incoming and outgoing containers performed though video and photographs. With respect to "live" reefer containers, however, VIT reefer mechanics ensure that reefers are visually checked at VIG before a delivering driver is released from the terminal. The steamship lines, like CMA, also take special precautions to ensure that human or

mechanical failures do not compromise frozen cargo.  At VIG, <u>all gensets are removed by MRS employees</u> and MRS charges all carriers, such as CMA, for genset removal services.

The Leighton truck arrived at the VIG gate and entered the terminal at 2:55 p.m. on October 27, 2016.  The genset mounted on the Container was operating and the Container displayed a digital temperature of -20° Celsius.  However, because of CMA's error in omitting the temperature requirement from the manual booking, VIT's booking information indicated that the Container was a reefer with <u>no temperature requirement</u>, i.e. not a "live" container. Although VIT inspected the Container upon arrival at VIG by video and photographs, its clerks did not notice the discrepancy between the booking information and the "live" reefer that appeared at the gate.  The Container was admitted to VIG and the driver received a routing ticket from the unmanned kiosk at the gate, instructing him to take the Container to "yard location 08L."  Although it is not indicated on the ticket, yard location 08L is a <u>non-powered</u> "stack" of containers that is not suitable for storing a "live" reefer with a temperature requirement.  The Routing Ticket instructed the driver that:

> If you are dropping off reefer in the stacks, proceed to 407 row first to have the genset removed.
>
> ** If parking reefer in the reefer rows WAIT WITH THE CONTAINER UNTIL REEFER MECHANIC ARRIVES TO CHECK THE CONTAINER IN!**

** DO NOT GO TO THE STACK WITH GENSET ATTACHED**[3]

At the time, VIT's Operations Manual provided detailed instructions for the handling of live export reefers assigned to the "reefer rows," where the truck chassis, with reefer attached, would be parked in an assigned slot. The driver was required to wait with the reefer in the reefer rows until a VIT reefer mechanic verified the container temperature. If the temperature was acceptable, VIT would plug the container into shore power and the driver would be released. At VIG, VIT is the entity responsible for plugging reefer containers into both shore power and vessel power. Because live export reefers were not ordinarily stored in "the stacks," VIT's Operations Manual provided no procedure for sending live export reefers to the stacks. The practice of sending a live export reefer to the stacks was considered by VIT to be unusual and abnormal and only done when the reefer rows were full.

---

[3] The "stacks" are an area where reefer and non-reefer containers are stacked and stored by a large mechanical crane. A genset attached to a reefer would compromise VIT's ability to safely stack the container. Accordingly, a reefer assigned to the stacks must have its genset removed before it is taken to the stacks by a delivery driver. When proper procedures are followed, after genset removal, the reefer is stacked in a row that has shore power, and subsequent to stacking, VIT personnel manually connect the reefer to shore power. In addition to the stacks, which are an available but atypical place to store live export reefers, the "reefer rows" are an area of the terminal where live export reefers are typically delivered and parked. In the reefer rows, there is no "stacking," but rather, the entire truck chassis is left behind with the reefer attached. Accordingly, a truck driver delivering a live reefer to an assigned spot in the reefer rows does not need to have the genset removed before the reefer/chassis is parked.

Only rows 3, 6, 9, 12, and 15 of the stacks contained reefer slots (i.e., these rows had shore power).

In accordance with the instructions on the printed VIG gate ticket, the Leighton driver drove to "row 407," where two of MRS's reefer mechanics confirmed (from looking at the gate ticket) that the Container was headed for the stacks, and not the reefer rows, and it therefore had to have its genset removed at that time.[4] The Container's refrigeration unit was switched off by MRS at 4:41 p.m. that day (Oct. 27, 2016), and the genset was removed. The Container was then taken to the stacks and was never connected to shore power at VIG, nor to ship power during oversees transport. Although the Container was powered-off on October 27, 2016, the cargo remained frozen and undamaged at the VIG terminal through at least October 28, 2016. The cargo was discovered to be a total loss upon delivery in Hong Kong in December of 2016.

When pre-tripping the reefer in Chesapeake, MRS posted a placard on the Container next to the control panel at eye level stating the booked temperature (-20° Celsius). Both MRS reefer mechanics working at VIG on the day the Container arrived have testified that they did not know that stack 8 at VIG had no powered

---

[4] Had the Container been assigned to the reefer rows, the MRS mechanics would <u>not</u> have removed the genset <u>at that time</u>, but would instead have directed the driver to park the chassis in the assigned spot in the reefer rows. VIT personnel would then "check" the reefer's temperature and plug it into shore power located in the reefer rows. The MRS mechanics would come around and remove the gensets from the newly arrived reefer-row containers at the end of the day.

reefer slots. At a corporate level, MRS was aware that row 8 of the stacks did not contain reefer slots. MRS Reefer Mechanic Glen Carpenter filled out a Reefer Receive/Release Log showing that the Container had been received at VIG (identified by container number) and that the temperature setting was -20° Celsius. This was the only CMA reefer received at VIG on October 27 and this log page included just one entry. Carpenter turned the log page into his MRS foreman at the end of his shift on October 27, 2016. The MRS foreman, Leo Castellanos, was responsible for preparing a Refrigerated Tracking and Monitoring log. Castellanos, or occasionally other MRS reefer mechanics, would check the temperature on CMA containers twice per day and record them in this log.

VIT's server problem was fixed late on October 27, and at 7:38 p.m., the VIT system finally showed the original booking made by CMA back on October 25, which included the proper temperature setting for the Container. Such updated booking did not, however, change any container-specific information in the VIT system, meaning that if MRS accessed VIT's system for information regarding the Container (as opposed to searching the system based on the booking number) the system would indicate that the Container was a loaded export reefer but would <u>not indicate a temperature requirement</u>.

The parties agree and stipulate that the contract or contracts between CMA and MRS involved in this case were maritime contracts within the meaning of that term for purposes of the Court's admiralty jurisdiction and choice of law in this case. The original plaintiffs settled their maritime claims against Eimskip, and CMA and Eimskip settled its third-party claims with VIT and Leighton. CMA settled with Plaintiffs by agreeing to pay them $260,000 in consideration of complete releases.[5]

### B. Facts Determined by the Court as Factfinder

1. MRS and CMA's business relationship is not governed by a written contract, but rather, such entities have established, through a long-term course of dealing, that MRS provides CMA with three distinct services relevant to this case: (a) MRS "pre-trips" reefer containers for CMA and arranges for their release; (b) MRS provides CMA with genset mounting and dismounting services at VIG, a service that is also provided to all other carrier companies that move reefers through VIG; and (c) MRS provides reefer temperature monitoring and container repair for CMA's reefers at VIG, although unlike the mounting/dismounting services, such monitoring service is not provided to all other carriers, as some

---

[5] Accordingly, the only remaining claim in this case is CMA's contention that it is entitled to complete indemnity from MRS for the settlement CMA paid to the original plaintiffs.

carriers contract directly with VIT for similar monitoring services.

2. Although MRS monitors CMA's live reefers twice daily while they are stored at VIG, unlike other terminals in the area, MRS is not responsible for, nor is it permitted, to intake such containers at VIG and plug them into shore power. Such intake duties, which include both confirming that the reefer is operating at the time of intake within an acceptable temperature range, and connecting the reefer to shore power, are borne solely by VIT.

3. MRS bills CMA separately for each aspect of its services as they are performed. Accordingly, an invoice is issued when MRS's storage facility in Chesapeake, Virginia releases a pre-tripped container, an invoice is issued for genset removal after gensets are installed or removed from CMA's containers at VIG, and an invoice is issued for the twice daily monitoring of the CMA reefers at VIG. No written contracts govern such services beyond the emails/orders sent by CMA to MRS to arrange for the pre-tripping/release of reefers needed for upcoming exports.

4. In order to conduct its monitoring services at VIG, the MRS foreman maintains a handwritten monitoring log. Each morning, and each afternoon, the foreman accesses the on-terminal "SPARCS" computer database maintained by VIT and prints a list of all CMA reefer containers that have been in-gated with temperature requirements. The SPARCS information is "live" and updates

constantly, including updates to the current location of each container at VIG, and this system can only be accessed by MRS while physically at the terminal. MRS cross-references the updated SPARCS list to its handwritten log twice a day to ensure that CMA's reefers are accounted for and being monitored. Pursuant to its course of dealing with CMA, MRS visually inspects each CMA reefer container with an assigned temperature requirement <u>twice a day</u> to ensure that the reefer is maintaining a temperature consistent with the booking information (the temperature requirement is available in the SPARCS system and is printed on the MRS "sticker" that is affixed to the exterior of the reefer when it leaves MRS's Chesapeake depot). Should there be any issues with a reefer, MRS performs necessary repairs without further guidance from CMA (and bills CMA for such repairs) except in those cases where the repair is major, in which case MRS contacts CMA to work out a plan for addressing the issue.

5. When a pre-tripped reefer is released from the MRS depot, certain MRS employees are aware of the intended local export terminal as well as the approximate date that the reefer will arrive at such terminal. However, because MRS turns over custody of the reefer, and because CMA does not notify MRS of any changes to the shipping timeframe, to include changes to the export vessel, export terminal, or the number of days that the container will be stored at the terminal prior to export, MRS does not "track" the

released container. CMA failed to present evidence at trial demonstrating that MRS had an obligation, whether express, implied, or through "course of dealing," to track a reefer after it is pre-tripped and released. Rather, MRS merely reacts when a CMA reefer is in-gated at a local terminal.

6. MRS has no functions at the VIG gate, nor does it have any direct communications with the gate regarding which containers have entered the terminal. MRS also has no role in: (a) assigning the VIG location where truck drivers should deliver a reefer designated for export; or (b) moving, or directing the movement of, reefers at VIG. Rather, VIT controls the movement of all containers at VIG. If a reefer being monitored by MRS is repositioned by VIT, VIT does not communicate with MRS either before or after the container is moved, and MRS is only "informed" of the move through accessing the real-time SPARCS system.

7. Because MRS has no control over where containers are stored at the VIG terminal, it has no ability to group containers by client in order to facilitate more efficient/effective monitoring.

8. As established through the deposition of CMA's Rule 30(b)(6) representative, CMA believed that MRS knew when a live reefer arrived at VIG through two channels: (1) MRS received a "printout" of the reefers that arrived each day (the SPARCS information); and (2) MRS created its own log from the "temperature check" it performed in "the lane" as part of the receiving function

13

at VIG. CMA believed that MRS would cross-check these lists to ensure that all live CMA reefers were accounted for.

9. Although CMA's representative may have accurately summarized how MRS tracks reefers at <u>other local terminals</u> where MRS does in fact perform initial intake temperature checks, he was mistaken as to the procedure at VIG. Notably, at VIG, the initial temperature check is performed by VIT personnel, rather than MRS personnel, and MRS therefore does not create a log of live reefers passing through a temperature check "lane" that it can later cross check against the SPARCS "printout." MRS's 30(b)(6) representative testified that MRS does maintain a log of the CMA reefers visually identified (twice daily) in the reefer rows and powered reefer stacks and cross checks that log against the SPARCS list. MRS would, of course, investigate the matter if its employees discovered a CMA reefer parked in the reefer rows, or powered reefer stacks, that did not appear on the SPARCS list; however, the Container at issue was not assigned to, nor stored in, either of these two appropriate areas.

10. Reefer containers are sometimes used to ship dry goods that do not require refrigeration, including situations where there are humidity concerns and when there is a surplus of reefers in the area.

11. MRS reefer mechanics perform genset install and removal for <u>all reefers</u> that arrive or depart VIG regardless of whether

the carrier contracts with MRS for any monitoring services. MRS creates a genset "Mount Dismount Log" and a "Reefer Receive/Reefer Release" log when it installs or dismounts a genset at VIG, but MRS does not cross-check either of these logs with its monitoring log.

12. Because the Container at issue was in-gated <u>without</u> a temperature requirement (due to the EDI server issue, the CMA manual input error, and the failure of the VIT gate inspection to discover that the Container was "live") VIT never performed an initial temperature check nor did it take any steps to plug the container into shore power. The Container never appeared on the relevant SPARCS list, and MRS never attempted to locate it or monitor it.

13. Based on CMA and VIT's errors, which dictated/controlled the handling of the Container at VIG, the Container was placed in a dry stack where: (1) there was no available power; and (2) it was essentially impossible for MRS, or anyone else, to visually "discover" the Container, and/or see the MRS "sticker" while monitoring other reefers because the unpowered stacks are physically inaccessible, rendering such misfiled Container effectively "hidden" once it entered the unpowered stacks.

14. CMA was aware of the disappearance/non-existence of the booking in the VIT system before the Container was "hidden" at VIG, yet it failed to take precautions to ensure that such reefer

was properly accounted for. Specifically, CMA did <u>not notify</u> MRS about the fact that it had to make a manual entry on October 27 to allow the Container entry to the VIG terminal.

15. If it had more robust procedures in place, and/or more knowledgeable reefer mechanics that knew which rows in the VIG stack were powered, MRS clearly "could have" discovered the error caused by CMA's and VIT's conduct. Had such error been discovered, MRS would have been obligated to investigate such issue on behalf of CMA because, within reason, MRS acts as CMA's "eyes and ears" at VIG.[6] That said, if it had more robust procedures in place, CMA likewise clearly "could have" discovered the error caused by its erroneous manual booking.

16. Although MRS had an established "course of dealing" with CMA aimed at protecting CMA's cargo, there was not a course of dealing that rendered MRS the virtual insurer of CMA's cargo. MRS did not operate VIG, did not assign container locations, and most notably, did not "intake" reefers to confirm temperature settings and/or "plug in" live reefers to shore power. MRS was clearly obligated through course of dealing to have procedures in place to

---

[6] The primary factual disputes in this case center around whether it was appropriate for MRS to perform its monitoring services at VIG without cross-referencing the reefer receipt log created during genset install/removal. Favoring MRS is the fact that VIT, rather than MRS, was responsible for intake/plug-in of all reefers at VIG, calling into question whether MRS's duty to monitor was ever triggered. Favoring CMA is the fact that, largely by happenstance, a MRS employee at VIG had actual knowledge that the Container at issue was "live" when it arrived at VIG (although he lacked the knowledge that the Container would later be "hidden" in the stacks).

monitor the integrity of CMA's refrigerated cargo at VIG, but its primary role was to ensure that the refrigeration units <u>continued to function properly</u>. The trial evidence failed to establish that course of dealing required MRS to adopt the best possible procedures, regardless of the cost or likelihood that such procedures were necessary.[7] Stated differently, the Court rejects CMA's suggestion that MRS was obligated to act as a "failsafe" against all errors, including booking errors committed by CMA.

17. Consistent with MRS's post-trial argument, through course of dealing, MRS was obligated to monitor all CMA reefers at VIG that were in-gated with a temperature requirement (and thus appeared on the relevant SPARCS printout), and it had the further duty to "discover" any CMA live reefer parked in the powered reefer stacks, or the reefer rows, that displayed a MRS "sticker" reflecting a temperature requirement.

## II. Conclusions of Law

As set forth in the Final Pretrial Order, CMA asserts that MRS breached its contract with CMA, that such breach caused the

---

[7] For further context, the trial evidence established that equipment exists that can be mounted to a live reefer to allow real-time tracking of a container's temperature. CMA did not elect to pay for this equipment for the Container at issue. Similarly, while MRS "could have" discovered CMA/VIT's errors if it performed more robust monitoring services, including a cross-check of SPARCS data to data MRS happened across as part of its separate duty to remove/install gensets for all carriers, CMA failed to demonstrate that it had elected to pay MRS to perform such function over time. Stated a little differently, the trial record failed to demonstrate that the parties' course of dealing allocated such responsibility to MRS.

damage for which CMA faced liability to other parties, and that MRS is liable, under maritime law, to indemnify CMA for the entire $260,000 settlement paid by CMA. MRS agrees that maritime law governs the instant dispute,[8] but asserts that it did not commit any breach of contract or violate any existing course of dealing. MRS further asserts that indemnity is not appropriate even if there was a contractual breach. The key legal disputes center on whether the maritime "warranty of workmanlike performance" applies and was breached, and whether indemnity is an available remedy.

## A. Implied Warranty of Workmanlike Performance

### 1. Background

The implied warranty of workmanlike performance, as applicable under maritime law, is a contractual warranty rooted in the Supreme Court's decision in Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124 (1956). In furtherance of its power to develop federal maritime law, the Supreme Court in

---

[8] In light of the parties' stipulation, the Court assumes that maritime law governs the dispute involving MRS's alleged failure to safeguard export cargo loaded into a maritime shipping container while such container was at the VIG terminal awaiting delivery to the stevedore. Cf. Wemhoener Pressen v. Ceres Marine Terminals, Inc., 5 F.3d 734, 739-43 (4th Cir. 1993). The Court further notes that the only claim remaining in this case is a breach of contract claim, and this Court would have jurisdiction over such claim even if it was not grounded in maritime law because it arises out of the same series of transactions and occurrences as those outlined in the original maritime complaint filed in this case, thus bringing the dispute within this Court's supplemental jurisdiction pursuant to Federal Rule of Civil Procedure 14(c). See Orient Overseas Container Line v. John T. Clark & Sons of Boston, Inc., 229 F. Supp. 2d 4, 14 (D. Mass. 2002).

*Ryan* adopted a rule shifting the shipowner's entire liability for personal injuries suffered by a longshoremen unloading cargo at a destination port, a liability grounded in the "seaworthiness" doctrine, to the stevedore company that had improperly secured such cargo at the origination port. Id. at 132-34; see Pryor v. Am. President Lines, 520 F.2d 974, 977 n.2 (4th Cir. 1975) (indicating that the constitutional grant of maritime jurisdiction to Article III courts "has been interpreted . . . as empowering federal courts to draw on and develop the substantive admiralty law"); Franza v. Royal Caribbean Cruises, Ltd., 772 F.3d 1225, 1231-32 (11th Cir. 2014) (discussing the grant of authority to all federal courts "to shape" and "develop" federal maritime law, to include the formulation of "flexible and fair remedies") (citations omitted). The Ryan Court explained that the stevedore's agreement to perform "all of the shipowner's stevedoring operations" during loading activities "necessarily includes" the obligation to stow the cargo "properly and safely," further indicating that "[c]ompetency and safety of stowage are inescapable elements of the service undertaken." Ryan, 350 U.S. at 133. Although "Ryan indemnity" for personal injuries suffered by longshoremen has been superseded by changes to the federal Longshoremen's and Harbor Workers Compensation Act, Ryan indemnity remains a valid maritime doctrine in this Circuit in at least some contexts. See Heyman v. Puerto Rico Marine Mgmt., Inc., 1992

A.M.C. 2654, 2656, 966 F.2d 1442 (4th Cir. 1992) (table) ("[E]ven though congressional action has made Ryan indemnity inapplicable to cases involving injuries to longshoremen, it is still a viable doctrine in cases such as this involving an injury to a seaman." (citing Campbell Indus., Inc. v. Offshore Logistics Int'l, Inc., 816 F.2d 1401, 1404-05 (9th Cir. 1987)).

CMA and MRS acknowledge the discord among the circuits regarding the breadth of the maritime "warranty of workmanlike performance," to include disagreements over the circumstances in which such warranty applies only as a theory of liability (i.e., a violation only establishes a contractual breach) and those where a violation of the warranty requires the violator to indemnify the other party to the contract, or a foreseeable third party. Cf. Marie R. Yeates Phillip, Contribution and Indemnity in Maritime Litigation, 30 S. Tex. L. Rev. 215, 230-39 (1989) (discussing the difference between using a violation of the warranty as a means to establish "fault" and using a violation to secure "Ryan-type indemnity"). As highlighted by CMA, the Fourth Circuit applies the warranty in a manner that permits indemnity under a broader test than that espoused by most legal commentators, although questions remain, even in this Circuit, as to whether the indemnity doctrine should be further extended beyond the few "special relationships" already recognized by the Fourth Circuit.

For the reasons explained below, this Court finds that, even under the broader approach applied in the Fourth Circuit, the implied warranty of workmanlike performance does not implicate the right to indemnity when the claimed breach results in cargo damage, prior to delivery to a stevedore, that was allegedly caused by a company that services and provides shore-based monitoring of refrigerated cargo containers. Alternatively, even if Fourth Circuit law recognizes a carrier's right to indemnity from a container company in such circumstances, here, CMA fails to demonstrate either that MRS had "custody" over the Container such that the warranty of workmanlike performance (and the associated right to indemnity) "attached," or that MRS violated its established course of dealing and/or violated the warranty by failing to perform its tasks with "reasonable care, skill, and diligence." Matter of Robbins Maritime, Inc., 906 F. Supp. 309, 314 (E.D. Va. 1995) (quoting Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-8 (2d ed. 1994))).

### 2. Duty to Indemnify under the Implied Warranty of Workmanlike Performance

As suggested above, the continued viability of the warranty of workmanlike performance has been called into question by numerous courts and commentators, at least to the extent that it is applied in a manner that allows for complete indemnity as a remedy for its violation. See 1 Thomas J. Schoenbaum, Admiralty

& Maritime Law § 5:15 (6th ed. 2018) (arguing that the far better view is that the contractual maritime warranty of workmanlike performance "is very much alive" and is generally implied in any maritime services contract; however, "[a]s an indemnity theory, the Ryan [warranty of workmanlike performance] is a withered doctrine of extremely limited application"); George R. Alvey, Jr., The Implied Warranty of Workmanlike Performance in Towage: A Viable Theory?, 7 Mar. Law. 1, 17 (1982) (explaining that the "Ryan warranty is conceptually distinguishable from Ryan indemnity" and that the "reasoning which is the basis for the Ryan warranty is not the same as that which is the basis for Ryan indemnity"); David W. Robertson & Michael F. Sturley, Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits, 35 Tul. Mar. L.J. 493, 532 (2011) (broadly referencing "the concept of an implied warranty of workmanlike performance" as doing "no useful work in current maritime law; it is just potentially confusing clutter"). The view held by such commentators is often supported, at least in part, by reference to Fairmont Shipping Corp. v. Chevron Int'l Oil Co., 511 F.2d 1252 (2d Cir. 1975), a case where the Second Circuit opined that the existence of the warranty as a general maritime contract principle is unremarkable, but that a distinction must be drawn between the existence of the warranty and the subset of cases where a violation of the warranty requires indemnification.

22

As explained by Professor Schoenbaum, consistent with the established law of multiple circuits, "the best view is that Ryan indemnity should be denied except in a very limited class of cases," as the genesis of the doctrine was to shift the shipowner's liability resulting from a vessel being in an "unseaworthy condition," a liability that attaches without fault, to the stevedore that created such unseaworthy condition. 1 Schoenbaum, Admiralty & Mar. Law § 5:15. As to maritime contract disputes that do not implicate a shipowner's strict liability, Schoenbaum posits that "principles of comparative fault apply." Id. at n.43; see Fairmont Shipping, 511 F.2d at 1256-57 (noting that the Second Circuit has repeatedly recognized that "it is the shipowner's strict liability for unseaworthiness that rests at the heart of Ryan indemnity" and that other Circuits have reached similar conclusions, including a Ninth Circuit case that found that indemnity was unavailable where a subcontractor was injured while repairing a vessel classified as a "dead ship" because such classification removed the issue of seaworthiness from the case) (citing Davis v. Chas. Kurz & Co., 483 F.2d 184, 187-88 (9th Cir. 1973)). While the availability of Ryan indemnity has been predicated on seaworthiness by various courts and commentators, such interpretation of the law is not universal, as recognized by the Second Circuit in Fairmont Shipping:

> Other decisions . . . have rested <u>Ryan</u> on the elements
> of expertise, control, supervision and ability to
> prevent accidents: The shipowner, relying on the
> stevedore's expertise, entrusts loading operations to
> its supervision and control, thereby putting the
> stevedore in the best position to prevent accidents.
> The same reasoning has been applied to 'dead tows,' <u>Tebbs
> v. Baker-Whiteley Towing Co.</u>, 407 F.2d 1055, 1058 (4th
> Cir. 1969); and ship repairs, <u>H & H Ship Service Co. v.
> Weyerhaeuser Line</u>, 382 F.2d 711, 712-713 (9th Cir.
> 1967). While these factors are certainly important,
> <u>Italia Societa per Azioni di Navigazione v. Oregon
> Stevedoring Co.</u>, 376 U.S. 315, 322-23 (1964), they omit
> the most significant aspect: the fact that the absolute
> duty of seaworthiness requires shipowners, regardless of
> their fault, to pay for accidents caused by stevedores.

<u>Fairmont Shipping</u>, 511 F.2d at 1257-58.[9]

### 3. Indemnity in the Fourth Circuit

Turning to the law in this Circuit, as acknowledged in

<u>Fairmont Shipping</u>, the Fourth Circuit has historically taken a

somewhat more expansive view of <u>Ryan</u> indemnity that is not linked

to "seaworthiness." That said, it has been nearly twenty years

since the Fourth Circuit discussed <u>Ryan</u> indemnity with any degree

of detail. <u>Chisholm v. UHP Projects, Inc.</u>, 205 F.3d 731 (4th Cir.

2000). Moreover, the discussion of the warranty in <u>Chisholm</u>

occurred in a "seaworthiness" case involving personal injuries

occurring on a vessel, thus removing from the calculus the issue

---

[9] The Second Circuit went on to define the "crucial elements" of <u>Ryan</u>
indemnity as requiring, among other things, that the "improper, unsafe or
incompetent execution of [maritime] services would foreseeably render the
vessel unseaworthy or bring into play a pre-existing unseaworthy condition."
<u>Fairmont Shipping</u>, 511 F.2d at 1258.

of whether complete indemnity is available in cases outside the seaworthiness context. Id. at 733-34.[10]

It appears that the next most recent substantive discussion of Ryan indemnity in a maritime case before the Fourth Circuit occurred nearly a decade earlier, but it too was a "typical" Ryan indemnity case as it involved both a stevedore and personal injuries occurring on a vessel during cargo loading operations. Heyman, 1992 A.M.C. 2654. Consistent with the Second Circuit's characterization of the Fourth Circuit's Tebbs decision, the unpublished Heyman opinion highlighted the fact that "the stated purpose of Ryan indemnity . . . is to place liability 'upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury.'" Id. at 2657 (quoting Italia Societa, 376 U.S. at 324). The Fourth Circuit further clarified that a shipowner's negligence does not preclude it from recovering in indemnity from the stevedore (who is in the best place to avoid the injury) unless the "shipowner's actions prevented or seriously handicapped the stevedore from performing its duties." Heyman, 1992 A.M.C. at 2657; cf. Matter of Robbins Maritime, 906 F. Supp. at 314-16 (concluding that indemnity was appropriate for the

_____

[10] In Chisholm, an engineer on a vessel sued the shipowner and the maritime service company hired to remove dust and scale from a vessel's ballast tanks after the service company's high-pressure cleaning hoses failed and severely injured the ship's engineer. Chisholm, 205 F.3d at 733. The shipowner settled with the plaintiff, and the service company ultimately conceded that "it had a duty to indemnify [the shipowner] in accord with the admiralty warranty of workmanlike performance." Id.

stevedore's breach of the warranty to "provide workmanlike stevedoring service," and expressly rejecting a "comparative fault" approach in "the Ryan context" based on Fourth Circuit precedent).

Preceding Heyman by nearly ten years was Little Beaver Enterprises v. Humphreys Railways, Inc., 719 F.2d 75 (4th Cir. 1983), a Fourth Circuit ship repair case that did not involve a stevedore or personal injuries, in which the Fourth Circuit described the maritime warranty of workmanlike performance as a "broad" warranty. Id. at 78; see De Carli v. Crusoe's Rivertown Motors, Inc., 68 F.3d 474 (6th Cir. 1995) (table) ("General maritime law requires that a contractor perform [vessel] repairs in a workmanlike manner.") (citing Little Beaver, 719 F.2d at 77-78). Specifically, the Fourth Circuit explained:

> This warranty need not be express to bind the ship repairer to use the degree of diligence, attention and skill adequate to complete the task. The warranty of workmanlike service, of course, does not make the repairer a guarantor of the results. Where it has performed its tasks as a skillful workman should, or where its efforts have been hindered by the actions of the other contracting party, the repair firm will not be held responsible for defects attributable to faulty workmanship. However, the warranty is otherwise very broad. It is comparable to a manufacturer's warranty of the soundness of its manufactured product. It has been applied to find fault where repair jobs are improperly performed; see, e.g., Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310 (2d Cir. 1958) (engine repair contractor); where the misdelivery of goods has caused monetary damages to shipowners, see, e.g., David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295,

299 (2d Cir. 1964);[11] and where efforts intended to prevent damage to a ship have been ineffective, see, e.g., Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc., 511 F.2d 1252 (2d Cir. 1975). . . .

> The significance admiralty law has historically attached to the repairer-shipowner relationship weighs heavily against Humphreys' narrow interpretation of its duties to Little Beaver. Limitations on the warranty of workmanlike service are not looked upon with favor and are strictly construed. Viewed in this light, the trial court's finding that Humphreys' selection and installation of an inadequate steering system constituted defective workmanship easily survives the clearly erroneous standard of review . . . .

Little Beaver, 719 F.2d at 78 (emphasis added) (some internal quotation marks and citations omitted). Although Little Beaver discussed the warranty of workmanlike performance through reference to prior indemnity cases, it did not involve an indemnity claim, nor did it involve any dispute as to whether the party seeking damages was partially responsible for the loss, thus eliminating consideration of relative fault. Id. at 78.

A year-and-a-half earlier, in Salter Marine, Inc. v. Conti Carriers & Terminals, Inc., 677 F.2d 388 (4th Cir. 1982), the Fourth Circuit rejected a stevedore's contention that it owed no duty to the owner and charterer of a tug hired to move an improperly loaded and "listing" barge that sunk during towing, finding instead

---

[11] In David Crystal, Inc., the Second Circuit found that, absent an enforceable contractual provision to the contrary, the carrier was "absolutely liable," as bailee, for the misdelivery of goods to the wrong party; further finding that the stevedore must fully indemnify the carrier for breach of the warranty of workmanlike performance as it was "the party who is best situated to adopt protective measures." David Crystal, Inc., 339 F.2d 295, at 298-99 (2d Cir. 1964).

that controlling law established that the stevedore's warranty of workmanlike performance extends to "foreseeable third parties," and that "it was unquestionably foreseeable that the owner and charterer of the tug might be injured if the stevedore performed improperly." Id. at 390. The Fourth Circuit's opinion went on to affirm the district court's finding that the owner and charterer of the tug were entitled to indemnity from the stevedore in a case that did not appear to involve any personal injuries. Id. at 390-91.[12]

Having carefully considered the above authorities, as well as other earlier-in-time Fourth Circuit opinions, including Tebbs, a case involving property damage caused to a yacht by a deficient "dead-tow" operation, this Court agrees with CMA that the Fourth Circuit has permitted litigants to secure indemnity based on a breach of the maritime warranty of workmanlike performance, to include indemnity for property damage, without requiring the underlying claim to be grounded in seaworthiness, or another similar "no-fault" doctrine. This Court remains bound by such opinions notwithstanding the "recent trend" in favor of limiting Ryan indemnity to personal injury cases and/or seaworthiness

---

[12] Subsequent to such case, multiple judges of this Court have concluded that indemnity from a stevedore is available in property damage cases involving a stevedore's failure to properly stow cargo. Matter of Robbins Maritime, 906 F. Supp. at 314; Complaint of Christiansen Marine, Inc., 1996 A.M.C. 2353, 1996 WL 616188, at *9 (E.D. Va. Apr. 11, 1996).

cases. See 2 Benedict on Admiralty § 11c. (2018) (indicating that the "more recent trend" in maritime law "seems to be that breach of [the] warranty of workmanlike service under Ryan is not a proper basis for indemnity in property damage cases"); 1 Schoenbaum, Admiralty & Mar. Law § 5:15 n.43 ("Ryan indemnity is available only where a shipowner is exposed to strict liability for unseaworthiness . . . ."); LCI Shipholdings, Inc. v. Muller Weingarten AG, 153 F. App'x 929, 932 (5th Cir. 2005) ("To the exten[t] that [the] WWLP as recognized in Ryan Stevedoring Co. still exists in this Circuit, it has been questioned, if not wholly displaced, as the appropriate model for indemnification of cargo damage.").[13] That said, this Court finds that controlling case law does not clearly resolve whether Ryan indemnity should apply beyond cases involving stevedores, ship repairs,[14] or towage contracts

---

[13] In Lubrano v. Waterman Steamship Co., 175 F.3d 274 (2d Cir. 1999), the Second Circuit concluded that "Ryan indemnity is virtually dead, at least in this Circuit," explaining that such judge-made doctrine was appropriately recognized in the past, but that it is no longer applicable due to the changing relationships between shipowners and stevedores, noting that "[h]ow this came to be, and in particular how it happened that a Supreme Court doctrine that was neither abrogated nor expressly overruled came no longer to apply, is a long and tortured tale." Id. at 276-77, 282-83.

[14] Although, in this Circuit, the warranty of workmanlike performance clearly applies to ship repair cases involving only property damage, Little Beaver, 719 F.2d at 78, such cases do not typically involve an indemnity claim, but rather, seek contract damages associated with the shipyard's failure to perform repairs in a workmanlike manner. See Dann Marine Towing, LC v. General Ship Repair Corp., No. CV MJG-12-1610, 2017 WL 3916992, at *11-*12, *27 (D. Md. Sept. 7, 2017) (ship repair company was liable for fire-damage to the vessel resulting from inadequate fire watch during repairs, and although the warranty of workmanlike performance was breached and deemed not subject to principles of comparative fault, it was "not an indemnity case"); Lyon Shipyard, Inc. v. Dann Marine Towing, LC, 2:11cv650, 2012 U.S. Dist. LEXIS 190236, *8-9 (E.D. Va. Dec. 18, 2012) (shipyard hired to

involving dead ships. <u>Cf.</u> 1 Schoenbaum, <u>Admiralty & Mar. Law</u> § 5:15 (describing the warranty of workmanlike performance as "one of the most ambiguous and controversial concepts in all of admiralty law"). Stated differently, while this Court is not in a position to question the right to indemnity in this Circuit in <u>previously recognized circumstances</u>, the Court does question CMA's effort to extend the indemnity remedy to a new class of case that does not involve bodily injuries to persons while aboard a vessel, property damage resulting from a stevedore's failure to safely secure cargo, damage caused by a tug pilot towing a dead ship, or a case involving some other maritime contractor (such as a shipyard) assuming responsibility over the safety of a vessel, or a portion of a vessel. In sum, just as the Fourth Circuit in <u>Tebbs</u> needed to carefully analyze whether the right to indemnity recognized in stevedore cases extends to a towage contract involving a dead ship (and concluded that it did), this Court carefully analyzes whether such right extends to a contract governing the shore-based monitoring of a reefer (and concludes that it does not).

---

repair/paint a barge, and to paint a tug, failed to perform in a workmanlike manner, and was liable to the shipowner for the cost of repainting both vessels as well as a portion of shipowner's lost revenue). If, however, faulty repairs result in a latent defect causing an unseaworthy vessel and the shipowner is held liable for property damage (such as cargo lost at sea), indemnity from the repairer would likely be appropriate under the Fourth Circuit's application of <u>Ryan</u>.

## B. <u>Ryan</u> Indemnity does not apply to the Facts of the Instant Case

Returning to the context of the instant case, MRS cites <u>Maersk Line Ltd. v. Care</u>, 271 F. Supp. 2d 818 (E.D. Va. 2003) for the proposition that the "<u>Ryan</u> duty" does not extend outside the context of stevedores to a case involving a purely economic loss. In <u>Maersk</u>, another judge of this Court favorably cited Schoenbaum for the proposition that the warranty of workmanlike performance can be a contract warranty (an avenue <u>not applicable</u> in <u>Maersk</u> based on the relationship, or lack thereof, between the plaintiff and the party from whom indemnity was sought) or it could alternatively be based on an implied indemnity theory, as established in <u>Ryan</u>.[15]  <u>Id.</u> at 826.  The <u>Ryan</u> indemnity doctrine was explained in <u>Maersk</u> as "typically . . . protect[ing] against actions causing unseaworthiness," with the court further finding that the cases cited by Maersk demonstrated that, outside the stevedore context, <u>Ryan</u> indemnity has only been applied in cases involving "physical injuries," and it therefore does not apply to a "purely economic loss."  <u>Id.</u>  Such holding was repeated, and arguably expanded, in <u>City of Norfolk v. Safe Boats Int'l, LLC</u>, No. 2:17cv159, 2017 WL 4112364, at *1 (E.D. Va. Aug. 25, 2017),

---

[15] As discussed herein, even as an implied indemnity theory, the warranty of workmanlike performance is grounded in contract.  <u>See</u> <u>Vaughn v. Farrell Lines, Inc.</u>, 937 F.2d 953, 957 n.4 (4th Cir. 1991) (rejecting the district court's finding that "a <u>Ryan</u>-type indemnity" was applicable in a maritime tort case, noting that <u>Ryan</u>-indemnity is a claim based in contract).

report and recommendation adopted sub nom. <u>City of Norfolk, Virginia v. Safe Boats Int'l, LLC</u>, No. 2:17cv159, 2017 WL 4108933 (E.D. Va. Sept. 15, 2017), which held that, "at least in the Fourth Circuit, <u>Ryan</u> only applies where a party is seeking indemnity for personal injury liability, not liability for breaching a contract (i.e., economic loss)" (citing <u>Maersk</u>, 271 F. Supp. 2d at 826)).

CMA responds to MRS's attempt to limit <u>Ryan</u> indemnity by citing <u>Little Beaver</u>, 719 F.2d at 77-79, and <u>Tebbs</u>, 407 F.2d at 1058-59.[16] As discussed above, <u>Little Beaver</u> is a ship repair case where a shipyard's installation of an inadequate steering system required the vessel to undergo additional costly repairs. While the Fourth Circuit found that the warranty of workmanlike performance was applicable and was breached, the discussion therein focuses on whether the ship repairer was <u>at fault</u> for selecting and installing the inadequate steering system, and at no point addresses "indemnity," instead referring to the "warranty of workmanlike service" as a "ground for liability." <u>Little Beaver</u>, 719 F.2d at 77-79. The analysis in <u>Little Beaver</u> did, however, highlight the "significance admiralty law has historically attached to the repairer-shipowner relationship." <u>Id.</u> at 78.

---

[16] CMA also cites to <u>Salter Marine</u>, 677 F.2d at 390, to illustrate that the warranty of workmanlike performance applies to property damage cases in this Circuit. <u>Salter Marine</u>, however, involved property damage resulting from a capsized barge that was improperly loaded <u>by a stevedore</u>, thus placing it squarely within the line of cases recognizing a shipowner's, or foreseeable third party's, right to indemnity based on inadequate <u>stevedore services</u>.

Turning next to <u>Tebbs</u>, such case involved property damage to a yacht from a maritime allision between a "dead ship" being undocked by three tugs and the moored yacht. <u>Tebbs</u>, 407 F.2d at 1056-57. The allision during undocking was caused by errors committed by the United States and the towing company, the former of which was responsible for securing inadequate mooring lines to the dead ship. <u>Id.</u> at 1057. In finding that the implied warranty of workmanlike performance was applicable to the towing company's performance, that it was breached, and that it required such company <u>to indemnify</u> the United States even though the United States was also at fault,[17] the Court described the warranty as being "most frequently applied" in the stevedoring context, but noted that "[a] similar warranty has been implied in other service contracts <u>involving comparable relationships</u>." <u>Id.</u> at 1058 (emphasis added). The Court then cited to six cases as examples of such relationships, <u>id.</u> at 1058 n.1, with the first five involving personal injuries to workers <u>while on board, or</u>

---

[17] CMA is therefore correct that <u>Tebbs</u> illustrates that the Fourth Circuit has awarded indemnity in a property damage case outside the stevedore context. However, this Court does not read <u>Maersk</u> as conflicting with <u>Tebbs</u> as <u>Maersk</u> involved a plaintiff attempting to secure indemnity in the absence of a contractual relationship (or third-party beneficiary status), and <u>Ryan</u>-indemnity is a <u>contract-based</u> theory that requires that the party seeking indemnity be, at a minimum, a "foreseeable third part[y]" to the contract at issue. <u>Salter Marine</u>, 677 F.2d at 390. Moreover, it appears that the "economic loss" being addressed within the <u>Ryan</u>-indemnity discussion in <u>Maersk</u> and in <u>Safe Boats Int'l</u> did not involve physical injury/damages to persons <u>or to property</u>, further distinguishing such cases from the property damage indemnity claim pending before this Court.

disembarking, a ship (performing repairs, painting, cleaning, etc.) and the last, Barbey Packing Corp. v. The S. S. Stavros, 169 F. Supp. 897 (D. Or. 1959), involving damages from a allision caused by a negligent pilot. Having considered such examples, the Fourth Circuit concluded in Tebbs that the warranty typically applicable to stevedores, and the associated remedy of indemnity, should also extend to a "contract of towage," noting that the vessel is turned over "to the control of the tug owner" and the shipowner relies on the tug captain's "expertise in conducting safe towing operations." Id. at 1059. Importantly, the Fourth Circuit's extension of Ryan indemnity to the towage context appeared to turn on the fact that the tug captain knew that the barge to be towed was a "dead ship," and thus, the tug was "responsible for both vessels" and had a "special duty in relation to the tow to take steps necessary for its safety and the safety of other vessels." Id. at 1057 (emphasis added) (internal quotation marks and citation omitted).

Synthesizing the above cases, and acknowledging the evolving interpretations of maritime law that distinguish between the general applicability of a contract-based warranty of workmanlike performance in all maritime service contracts, and a warranty arising out of a "special relationship" that brings with it a right to indemnity, this Court rejects CMA's efforts to extend Ryan indemnity to a property damage case outside the stevedoring/ship

repair/dead-ship towage context in which the party from whom indemnity is sought did not have a "special relationship" with the party seeking indemnity. Such "special relationships" appear to occur when a maritime contractor exercises control over a vessel, or a portion of a vessel, with the implied promise of performing loading/unloading services, repairs, or towage services of a dead ship _in a safe_ and competent manner. Outside these scenarios involving a "special relationship" between the shipowner and the maritime contractor, a duty of workmanlike performance is still owed, but a violation of such duty is subject to resolution through traditional contract-law remedies rather than implied indemnity, particularly in property damage cases. Cf. <u>Parks v. United States</u>, 784 F.2d 20, 25 (1st Cir. 1986) ("A contractual right to indemnity may be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety, or when there is a generally recognized special relationship between the parties.") (internal quotation marks and citation omitted).

Declining to further extend <u>Ryan</u> indemnity beyond cases involving the "special relationship" between a shipowner and a stevedore, ship-repair contractor, or tug pilot towing a "dead ship," is both sensible and equitable. See <u>In re Columbia Leasing L.L.C.</u>, 991 F. Supp. 2d 722, 729-30 (E.D. Va. 2014) (indicating that indemnity was the proper remedy in <u>Ryan</u> based on the Supreme

Court's recognition of "the inequity of shifting the entire burden of a third party's negligence onto the shipowner"); see also TransDulles Ctr., Inc. v. USX Corp., 976 F.2d 219, 228 (4th Cir. 1992) (noting, outside the maritime context, that "[a]lthough an implied right to indemnity may be read into some contracts, only unique factors or a special relationship between the parties give rise to such a right"); Int'l Fidelity Insurance Co. v. W. Virginia Water Auth., No. 7:11cv441, 2012 WL 5364196, at *3 (W.D. Va. Oct. 30, 2012) (describing Ryan indemnity as arising out of the "unique relationship between two parties" and indicating that such relationship "supplie[s] a right to indemnification not expressly stated in the parties' contract"). When stevedoring, repairs, or similar services are performed onboard a vessel, the maritime contractor's "special relationship" with the ship/shipowner, special position of expertise, control over at least a portion of the vessel, ability to cause an unseaworthy condition, and potential to cause physical harm to persons onboard, generally warrant indemnity.[18] Cf. Chisholm, 205 F.3d at 733. As to towage

---

[18] While "not an indemnity case," Dann Marine Towing, LC v. General Ship Repair involved a dispute over whether comparative fault was applicable in a ship repair contract, with the district court relying on Matter of Robbins Maritime, and other stevedoring or seaworthiness cases, to conclude that the Fourth Circuit has never embraced a comparative fault approach. Dann Marine Towing, 2017 WL 3916992, at *11, *27. In this Court's view, Fourth Circuit case law does not squarely address whether a comparative fault approach is appropriate outside the context of cases involving stevedores, seaworthiness, or dead-ship towage cases, although it does appear that the facts of Dann Marine Towing involved the confluence of a "special relationship" and the contractor being in the best position to avoid the damage caused by the fire on the vessel being repaired. In considering

36

cases, at least in scenarios involving a "dead ship" where the tug captain has exerted complete control over the tow operation, the Fourth Circuit has elected to extend the right to indemnification based on the complete control exerted over the vessel by the tug captain—which is another form of "special relationship" directly involving the vessel. See Cargill, Inc. v. C & P Towing Co., 1991 A.M.C. 101, 111-12, 1990 WL 270199, at *7 (E.D. Va. Aug. 16, 1990), aff'd, 1992 A.M.C. 392, 943 F.2d 48 (4th Cir. 1991) (table) (explaining that the Fourth Circuit's language in Tebbs evidences its intent to "limit the application of an implied warranty of workmanlike service to cases involving 'dead tows'"); Tebbs, 407 F.2d at 1057 (discussing the "special duty" applicable when towing a "dead ship").

In contrast, when a land-based container company agrees to "pre-trip" a cargo container to ensure that its refrigeration system is operating, and agrees to later verify, through simple

---

whether the indemnity remedy should be further extended, this Court notes the Fourth Circuit's express recognition in Farrell Lines, Inc. v. Carolina Shipping Co., 509 F.2d 53, 54 (4th Cir. 1975) of "the equitable appeal of the claim of apportionment raised by the stevedore," and while the Fourth Circuit in Farrell Lines concluded that it lacked the authority to deviate from Ryan, this Court is not similarly bound when determining whether such indemnity doctrine should be extended further outside the stevedore context. This Court also notes the footnote discussion in Little Beaver, 719 F.2d at 77 n.5, regarding the continued viability of the warranty of workmanlike performance, which included a reference to Gorman, Francis J., Ryan Indemnity in Maritime Property Damages Cases: What of Proportionate Fault, 8 U. Balt. L. Rev. 42-69 (1978). Such article concludes that "[t]here will be a re-examination of the rationale of Ryan indemnity resulting in different and more limited applications," and that "[t]he objective should be to avoid the all-or-nothing consequences of Ryan indemnity in property damage cases in favor of a proportionate allocation of damages . . . ." Id. at 66.

visual inspection, that such container's refrigeration system is both set to the proper temperature and maintaining such temperature while stored at a terminal awaiting transfer to the stevedore, the facts do not implicate any special duties or any "special relationship" involving a vessel.[19]  Rather, the essence of the contract at issue in this case was simply for MRS to ensure that reefer containers stay cold while awaiting transfer to the carrier/stevedore—a task unrelated to seaworthiness, vessel safety, safety to other vessels or the public, or safety to crewmembers or anyone else onboard a vessel.  Cf. Calmar S.S. Corp. v. Nacirema Operating Co., 266 F.2d 79, 80 (4th Cir. 1959)

---

[19] It appears that, in some circuits, such shore-based contract may not even be interpreted as a "maritime contract."  See Colgate Palmolive Co. v. S/S Dart Canada, 724 F.2d 313, 315 (2d Cir. 1983) ("[A]n action against a terminal for negligent loss of cargo is not within federal maritime jurisdiction, but is a state claim governed by state law."); Marubeni-Iida (Am.), Inc. v. Nippon Yusen Kaisha, 207 F. Supp. 418, 419 (S.D.N.Y. 1962) ("[C]ourts are not agreed on whether admiralty has jurisdiction over an action for damage to cargo held in a dock warehouse prior to loading.").  That said, as noted above, this Court accepts the parties' stipulation that, in this Circuit, federal maritime law controls the instant dispute.  Cf. Wemhoener Pressen, 5 F.3d at 739-41, 743.  While maritime law is assumed to control, the distinction between vessel loading/unloading services provided by a stevedore and shore-based reefer monitoring services provided by a container company remains critically relevant to the determination of whether a "special relationship" exists.  In La Salle Mach. Tool, Inc. v. Maher Terminals, Inc., 611 F.2d 56 (4th Cir. 1979), a case involving cargo that was negligently damaged by a terminal operator prior to any stevedoring activities, the parties' stipulations led the Fourth Circuit to resolve the case without "determin[ing] whether state or federal law" governed the appeal.  Id. at 57, n.1.  However, in holding that the terminal operator could not limit its liability under the maritime carrier's bill of lading, the Fourth Circuit distinguished a stevedore from a terminal operator, describing the former as "historically . . . considered to occupy a special relationship with the carrier" as its loading services "fulfill[s] the carrier's responsibility under the contract of carriage," and the latter as lacking such "unique status" when "performing [the] non-maritime function" of unloading cargo from a truck upon arrival at the harbor.  Id. at 59 n.4.

(recounting the district court's characterization of the duty owned by a stevedore under <u>Ryan</u> as being based on the fact that the service contract "implies a promise by the <u>expert stevedore</u> to perform 'with <u>reasonable safety</u>'") (emphasis added); <u>Frasca v. S/S Safina E. Ismail</u>, 413 F.2d 259, 261 (4th Cir. 1969) (discussing <u>Ryan</u> indemnity as a "ship's right," indicating that the warranty of workmanlike service is a "duty <u>to the ship</u>" that is "comparable to a manufacturer's warranty of merchantability" and noting that a contractor breaches such "warranty when he fails to remedy <u>hazards</u> tolerated by the shipowner") (emphasis added). Accordingly, acknowledging that a maritime "course of dealing" contract to monitor live export reefers requires "workmanlike performance," i.e., performance with reasonable skill and diligence, the appropriate <u>remedy</u> for a breach of such contractual obligation is not complete indemnity. <u>See</u> <u>Hanover Ins. Co. v. Corrpro Companies, Inc.</u>, 312 F. Supp. 2d 816, 821 (E.D. Va. 2004) (explaining, in a non-maritime case, that "[i]n the contracts context, equity is more hesitant to imply an indemnity right, because if the parties desired to create an indemnitor-indemnitee relationship, they could have done so expressly in the contract").[20]

---

[20] Limitations on the reach of <u>Ryan</u> <u>indemnity</u> are necessary because the Fourth Circuit has, at least in the context of stevedores and injuries associated with a vessel's seaworthiness, stated that "the warranty of workmanlike performance arises without fault and appears to approach strict liability." <u>Chisholm</u>, 205 F.3d at 734 (citing <u>Salter Marine</u>, 677 F.2d at

Although the Fourth Circuit has, on multiple occasions, described <u>Ryan</u> indemnity as grounded in the effort to shift liability to the party in the best place to avoid the injury/damage, such cases necessarily involve "special relationships" that justify the total shift in liability. <u>See Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.</u>, 838 F.2d 124, 127 (4th Cir. 1988) (indicating that a "special relationship" was recognized in <u>Ryan</u> "since the stevedoring company had agreed to perform all the shipowner's stevedoring operations" yet the shipowner retained a non-delegable duty to provide a seaworthy vessel). In the absence of such a special relationship, complete liability cannot be shifted merely because one entity is in a better position to avoid a contractual breach; notably, the breaching party in any contractual relationship, inside or outside

390). Other cases have described the warranty of workmanlike performance differently in other contexts, indicating that it is not breached if a ship repairer "performed its tasks as a skillful workman should." <u>Little Beaver</u>, 719 F.2d at 78; <u>see also In re McAllister Towing of Virginia, Inc.</u>, No. CIV.A. 2:00cv36, 2000 WL 1881197, at *10 (E.D. Va. July 11, 2000) (finding that the implied warranty, as applicable in towage cases, requires that the tug was negligent); Schoenbaum, 1 Admiralty & Mar. Law § 5:15 (noting that, as a contract doctrine, the warranty is "not fully applicable to towing contracts . . . at least insofar as it conflicts with the admiralty rule imposing liability only for negligent conduct"). It appears unjust, and unnecessary, to extend the complete indemnity remedy to all manner of maritime service contracts, particularly if such indemnity right is triggered by a standard that approaches strict liability. Therefore, in light of the nature of the issues in <u>Chisholm</u> and <u>Salter Marine</u>, as well as the context of the above-quoted "strict-liability" statement from <u>Chisholm</u>, it appears that it is appropriate to read such statement as follows: "the warranty of workmanlike performance [<u>as applicable to stevedores or other maritime contractors causing a dangerous condition on a vessel</u>] arises without fault and appears to approach strict liability."

of maritime law, is the party in the best position to avoid its own breach.

For these reasons, this Court is unwilling to expand the list of defined "special relationships" that give rise to an implied right of complete indemnification far enough to reach the facts of the instant case.[21] See id. (indicating, in a case that did not involve a maritime dispute, that the Court's task was to decide "whether there is a special contractual relationship between the parties that gives rise to an implied right to indemnification") (emphasis added); see also Franza, 772 F.3d at 1231-32 (discussing federal district courts' authority "to shape" and "develop" federal maritime law); cf. Franklin Stainless Corp. v. Marlo Transp. Corp., 748 F.2d 865, 867 n.1 (4th Cir. 1984) (finding it unnecessary to re-examine Ryan and its progeny, but expressly noting that "a purpose of the 1972 amendments to the Longshoremen's and Harbor Workers Compensation Act . . . was to abrogate" the "aspect of Ryan" providing for contractual indemnity). CMA's claim seeking indemnity from MRS, based on MRS's alleged violation of

---

[21] The Fourth Circuit's description of the warranty of workmanlike performance as "broad" and its instruction that limitations on such warranty should be "strictly construed," Little Beaver, 719 F.2d at 79, are interpreted by this Court as addressing the scope of the performance obligation as well as contractual efforts to limit the warranty in cases where it is applicable, not a reference to the breadth of cases in which indemnity is the proper remedy for a violation of the warranty. Notably, neither indemnity nor principles of comparative fault are even discussed in Little Beaver.

the Ryan warranty of workmanlike performance, fails as a matter of law.[22]

### C. No Duty to Monitor Attached in this Case because Control/Supervision was not Relinquished to MRS

Alternatively, even if Fourth Circuit law permits a carrier to invoke Ryan to secure complete indemnity from a shore-based container company that contributes to cargo damage in its possession while awaiting transfer to a stevedore, the Court finds that CMA is not entitled to indemnity in this case. Importantly, CMA's evidence failed to demonstrate that CMA turned the "[Container] over to the control of [MRS] and relie[d] on the latter's expertise in conducting safe [monitoring] operations." Tebbs, 407 F.2d at 1059. Rather, as discussed below, the Court agrees with MRS that the trial record demonstrates that, because of the booking error committed by CMA, "control" over the Container was never effectively turned over to MRS for twice daily monitoring.

Although it is clear that the Container was briefly encountered by MRS at the VIG terminal for the limited purpose of

---

[22] While not briefed by the parties, there is authority suggesting that the result would be the same in this case even if Virginia law applied. See Birdneck Villas Condo. Ass'n Bd. of Directors v. Birdneck Villas, L.L.C., 73 Va. Cir. 175, 181 (2007) (noting the absence of any "Virginia cases that are particularly instructive as to when a right to indemnity should be implied in a contract," but stating that an indemnity agreement cannot be read into a contract absent "a special relationship between the parties"); Allied Terminals v. HMT, Inc., 89 Va. Cir. 206, 211 (2014) (requiring "unique factors" or a "special relationship" in order to establish implied contractual indemnity, further noting that it appears that "the existence of a simple contract is insufficient").

genset removal, such removal function was properly performed, and the Container was then taken to an area of the VIG terminal that was not accessible to MRS. The trial evidence establishes that no duty to monitor the Container arose unless there was: (1) an actual transfer of custody to MRS, or at a minimum, a transfer of the Container to the "reefer rows" or physically accessible powered reefer stacks at VIG; (2) proper notice to the MRS personnel responsible for monitoring CMA's containers that a "live" reefer with a temperature requirement had arrived at VIG (i.e., notification through "SPARCS"); or (3) proof of an established course of dealing requiring MRS to use its genset mount/dismount area at VIG to double as an "intake verification" area such that MRS was obligated to ensure that CMA/VIT had not mis-booked and misclassified a live reefer. At trial, CMA failed to demonstrate that any of such triggers occurred in this case, and thus, MRS's duty to monitor was never triggered.[23]

CMA's 30(b)(6) representative, who did not testify at trial, but instead appeared through deposition, indicated under oath that

---

[23] The trial evidence reflects that, at any other local terminal where MRS was performing intake functions, MRS likely would have been deficient for failing to cross-check its reefer receipt log with the terminal's data; however, at VIG, MRS had no intake or "screening" role. Because VIT was responsible for intake/screening functions at VIG, if a container was rejected by VIT during intake based on a non-compliant temperature, MRS's duty to monitor such container would plainly never arise. Similarly, when VIT both fails to perform an initial temperature check, and in essence "hides" a live reefer from MRS by assigning it to the unpowered stacks, MRS is under no duty to monitor such container absent a more clearly defined "course of dealing" or written contract outlining such obligation.

he believed that MRS was responsible for performing the initial temperature verification during the intake process at VIG. CMA later stipulated that it was actually VIT personnel who perform such duties at VIG; however, CMA's earlier-in-time mistaken understanding of MRS's role/responsibilities at VIG illustrates the absence of a "meeting of the minds" regarding the scope of MRS's monitoring services. More specifically, the Court finds that there was not a meeting of the minds, or otherwise an "implied" obligation for MRS to: (1) track a CMA reefer from the time it leaves the MRS depot in Chesapeake until the time it is transferred to the stevedore for loading on a vessel at VIG; (2) track, verify, or inspect, every CMA reefer container that entered VIG, irrespective of whether the VIG SPARCS booking information for such container included a temperature requirement; and (3) utilize its genset removal lane to verify that two separate business entities with their own respective roles and responsibilities (CMA and VIT), including roles performed solely to ensure the safekeeping of refrigerated cargo, properly completed their booking, intake, and storage assignment duties.

Such finding is not tantamount to a finding that MRS had no duty to "troubleshoot" known or suspected incidents at VIG and/or that it had no duty to act as CMA's "eyes and ears" at the terminal. Although VIT was the entity responsible for both verifying the arrival temperature of live export reefers and plugging such

44

containers into shore power, it would be improper to conclude that MRS's monitoring obligation was never "triggered" unless a reefer was properly booked and/or that it was not triggered until a reefer was plugged in by VIT. Rather, MRS's obligation typically began when a container was in-gated with a temperature requirement in its electronic booking and allowed to remain at the VIG terminal— had a truck driver parked such container in the wrong place, and/or had VIT failed to plug such container in, MRS would still be on notice from the SPARCS data that it was on the premises and would have an obligation to locate it and ensure that it continued to operate properly. Similarly, even if a proper booking did not exist, if a CMA reefer with the MRS "sticker" on its exterior was parked in the reefer rows, or the powered reefer stacks, yet did not appear on the SPARCS list, MRS would have been obligated to investigate the situation in order to protect CMA's cargo. However, neither of such factual scenarios occurred in this case, and CMA failed to demonstrate that the abnormality that did occur "should have" been identified by MRS on these facts.

Consideration of which entity was "best situated" to avoid the loss, a factor referenced in multiple Ryan indemnity cases from this Circuit, further supports such analysis. VIT's server error caused the initial proper booking to be ineffective for several days, an error that VIT was "the party best situated" to control for and/or avoid. Tebbs, 407 F.2d at 1058. CMA then

failed to enter the critical temperature requirement into the replacement "manual booking," an error that CMA was the party "best situated" to control for and/or avoid.[24] Even assuming, for the sake of argument, that it would have been difficult for CMA to discover its manual booking error after it occurred, CMA was still fully aware of the "missing" electronic booking, the need for the manual entry, and it later discovered the EDI server issue, yet CMA never contacted MRS to share the fact that there may be a problem with the SPARCS data, data that CMA knew that MRS used to facilitate MRS's monitoring services. CMA therefore arguably remained in the best position to avoid cargo damage because, unlike MRS, CMA had, at a minimum, a reason to question the accuracy of the "live" SPARCS data before the cargo damage occurred.[25]

After the above errors were committed, a MRS employee performed his genset removal responsibilities as required under a course of dealing between CMA and MRS that was separate and

---

[24] CMA contends that MRS would have caught the booking error had its foreman at VIG simply reviewed the genset/container logs in MRS's possession. However, the same can be said for CMA—had a CMA supervisor simply reviewed the manual booking for accuracy (data CMA presumably possessed or had access to), the precipitating event causing the cargo loss could have been easily detected.

[25] As discussed at length herein, after CMA's errors were committed, VIT committed compounding errors by failing to catch the data inconsistency at the VIG gate, which caused VIT to: (1) bypass a temperature check; (2) assign the Container to an improper storage location that was not accessible to MRS; and (3) fail to plug the Container into shore power. As VIT was responsible for "automating" the VIG gating system, and was responsible for performing the initial screening of inbound live reefers, VIT was arguably the entity at VIG in the best position to catch CMA's booking error.

distinct from monitoring services. MRS disconnected all gensets for all carriers at VIG irrespective of whether MRS had an independent agreement to perform monitoring for such carrier. MRS also billed its genset install/removal separately from its monitoring services.[26]

After disconnecting the genset in a manner fully consistent with MRS's established course of dealing, and fully consistent with the "real-time" instructions the MRS mechanic received from VIT through the VIG gate ticket, the MRS mechanic reasonably assumed, within the scope of his responsibilities and within the scope of MRS's course of dealing with CMA, that VIT performed its obligations to assign the Container to a proper location and plug it in to shore power. MRS's genset mechanic surely "could" have discovered the booking/stack assignment errors had he been more knowledgeable about the layout of the VIG "stacks," and MRS likewise "could" have discovered the error had its foreman reviewed the records prepared by the genset mechanic. However, in the absence of evidence suggesting that MRS was hired by CMA to perform "screening" at the genset removal lane in order to advance the efficacy of their monitoring services, its mechanic's physical proximity to the "live" reefer at VIG is insufficient to convince

---

[26] The same reefer mechanics that removed gensets "occasionally" performed monitoring services; however, they only did so at the instruction of the MRS foreman, who was responsible for preparing the monitoring log and overseeing the monitoring activities.

the Court that MRS was "in the best position" to avoid the damage in this case. Stated differently, even if MRS was in the <u>best location</u> to avoid the damage (because its employees were physically at the terminal), CMA fails to demonstrate that the parties' course of dealing contemplated that MRS would perform the "cross-check" monitoring that CMA now asserts was deficiently omitted. Because the Container was never parked in the VIG reefer rows or powered reefer stacks, and because it was not otherwise handed over to MRS for monitoring (it was handed over to MRS for the limited purpose of removing the genset before it was immediately released back into the custody of the truck driver), the warranty of workmanlike performance never "attached." See <u>U.S. Fire Ins. Co. v. S/S Jebel Ali</u>, 872 F. Supp. 1283, 1286 (S.D.N.Y. 1995) (finding that, pursuant to the contract between the parties, the third-party defendant was <u>not</u> "responsible for the maintenance and monitoring of cargoes in refrigerated containers," and that "[s]ince [it] was not obligated to perform such a service, it was, <u>a fortiori</u>, not required to perform the service in a workmanlike manner").[27] CMA's claim therefore alternatively fails on the merits.

_____

[27] To the extent that the above findings are insufficient to address any ongoing dispute regarding whether the parties' contract/course of dealing included an implied contractual agreement (untethered to <u>Ryan</u>) that MRS would provide indemnity, the Court agrees with MRS that the there was no such contractual term.

## D. Implied Warranty was not Breached

Alternatively to the above, even if MRS had sufficient "control" over the Container for the warranty of workmanlike performance to "attach" when the Container was brought to the genset removal area, CMA fails to demonstrate that MRS failed to provide skillful performance, and thus, neither indemnity, nor recovery under traditional contract principles, are appropriate in this case.[28]

As a provider of maritime services, MRS was not "an insurer against accidents," rather, the extent of the warranty of workmanlike performance "depends on the circumstances of (the) case relating to control, supervision, and expertise." Tebbs, 407 F.2d at 1059 (internal quotation marks and citation omitted). Moreover, "the question of what is required . . . [to constitute] workmanlike performance is necessarily a factual question that naturally varies from case to case based on the scope and nature of the service being undertaken." Dann Marine Towing, LC v. Gen. Ship Repair Corp., No. CV MJG-12-1610, 2017 WL 3916992, at *10 (D. Md. Sept. 7, 2017) (quoting Northern Insurance Co. of New York v. Point Judith Marina, LLC, 579 F.3d 61, 68 (1st Cir. 2009))

---

[28] CMA did not present evidence seeking to demonstrate the proportion of damages it purportedly suffered as a result of MRS's alleged contractual breaches (as compared with the cargo damage caused by VIT and/or the stevedore's failure to ensure that the Container was plugged into vessel power). Therefore, even if MRS had proved a contractual breach, it failed to prove its damages.

(emphasis added). As explained in <u>Little Beaver</u>, 719 F.2d at 78, a ship-repair case discussing the warranty as a means to establish liability for a breach of contract, at least in cases outside the stevedoring/seaworthiness context, the warranty requires a contractor "to use the degree of diligence, attention and skill adequate to complete the task." <u>Little Beaver</u>, 719 F.2d at 78.

### 1. Reefer Mechanic

The "expertise" of the MRS mechanic that removed the genset involved: (1) installation and removal of gensets; and (2) mechanical repair to the refrigeration units on reefers. His expertise reasonably did not involve the proper storage locations for reefers in "the stacks" at a terminal operated by another entity. Moreover, even though storing a live export reefer in the stacks at VIG was "unusual," the best interpretation of the factual record is that the MRS mechanic had <u>no duty</u> to stop performing his assigned function and question the VIT routing ticket in the busy genset install/removal lane where hundreds of reefers may be processed on a given day. Rather, the mechanic confirmed from the VIG ticket that genset removal was necessary in "the lane," he removed the genset (presumably in a workmanlike manner), he documented his actions in written logs that can be used to verify the specific genset that was installed or removed and the specific inbound or outbound reefer container, and he reasonably presumed that VIT had performed, and would continue to perform, its roles

in a workmanlike manner regarding the proper intake and handling of such Container (to include plugging it into shore power).

As evidenced by the trial testimony, the reefer mechanic's primary responsibility at VIG is to keep "the line" of trucks moving by installing a genset on every outbound truck departing with a live reefer, and removing a genset from any inbound truck with a VIG ticket indicating that such reefer was assigned to "the stacks." While it is stipulated that the MRS mechanic both recognized that the Container was "live," and powered down such reefer (as was necessary to remove the genset), he did so with the reasonable expectation that it would be powered back up by VIT shortly after it was taken to the stacks. Based on the evidence documenting the parties' course of dealing at this terminal, and MRS's limited control/supervision over reefers at VIG during the intake process, CMA fails to demonstrate that the scope of the services undertaken by MRS was sufficiently broad such that the warranty of workmanlike performance was breached by the MRS mechanic that removed the genset.

### 2. MRS Foreman

The MRS foreman was responsible for tracking, and performing twice daily monitoring, of live CMA reefers at VIG to ensure that such reefers continued to function properly and maintain the required temperature. While a closer call than the evaluation of the reefer mechanic's performance, the Court finds that CMA has

not demonstrated that the MRS foreman failed to perform with the requisite level of diligence by failing to review logs associated with a separate business function (mounting/dismounting) in order to verify that VIT employees, and/or CMA employees, did not commit errors when performing their distinct obligations (booking, in-gate inspection, initial temperature check, plugging in live reefers). Rather, the better interpretation of the trial record is that MRS was hired to verify that: (1) every CMA reefer that arrived (and remained) at VIG with a temperature requirement in its booking maintained the required temperature during storage; and (2) every CMA reefer parked in the reefer rows or powered reefer stack was accounted for and monitored.

The fact that the MRS foreman was physically present at VIG does not establish that MRS failed to perform in a workmanlike manner because it did not cross-check records from one business function with records from the other. Notably, driven by CMA's booking error, VIT essentially "reported" to the MRS foreman through the SPARCS system that the Container at issue did not need to be monitored. As acknowledged by CMA, the applicable legal standard does not permit recovery if CMA's actions "prevented or seriously handicapped [MRS] from performing its duties," Heyman, 1992 A.M.C. at 2657, and based on the scope of MRS's duties as established through course of dealing, CMA appears to have seriously handicapped MRS by causing the Container to be "hidden"

in the unpowered stacks, an act that directly interfered with MRS's monitoring activities. Furthermore, CMA never told MRS about the need for the manual booking on October 27, 2016, and at least some individuals at CMA knew about the EDI server issues by the early afternoon on October 28, 2016; communication with MRS on that date could still have avoided the cargo loss. In sum, because MRS was not hired to perform "intake" functions beyond the manual process of removing gensets, MRS, through its foreman, performed with "reasonable care, skill, and diligence" based on the scope of the services MRS agreed to undertake. <u>Matter of Robbins Maritime</u>, 906 F. Supp. at 314. CMA could certainly have contracted with MRS, and compensated MRS, to perform a more robust monitoring service, but the trial record fails to demonstrate that such level of monitoring was required under the parties' existing course of dealing.[29]

The fact that MRS acted as CMA's "eyes and ears" at VIG and previously took steps to respond to unusual situations <u>that it noticed</u> also does not establish that MRS acted without reasonable diligence based on its failure to "catch" the CMA/VIT errors that caused the damages at issue in this case. In a comparable

---

[29] For the reasons discussed herein, to the extent CMA challenges MRS's failure to maintain better communication between its Chesapeake depot and its employees at VIG, the parties' course of dealing did not require MRS to base its monitoring at VIG on information known by depot employees, and the absence of such communication does not equate with a lack of diligence.

scenario, the First Circuit addressed, and rejected, a claim that the scope of the defendant's inspection/repairs during a prior ship "commissioning" rendered it duty-bound to perform broad inspections during the vessel commissioning at issue in that case. Northern Insurance, 579 F.3d at 69. The First Circuit explained that "the fact that [the defendant's] agents previously made repairs to a particular component [during commissioning] does not compel the conclusion that a workmanlike commissioning process should include an inspection of such components." Id. Rather, the "factual question" at issue turned on whether the "scope of the work contemplated" in the parties' agreement included such inspections, and the court found that the plaintiff "failed to establish that [the defendant] had explicitly or implicitly undertaken to inspect the vessel for hidden defects." Id. Similarly, here, this Court concludes that CMA failed to demonstrate that MRS "explicitly or implicitly," agreed that its foreman would use the logs created by the genset removal mechanics in order to "screen" inbound reefers at VIG to uncover CMA booking errors compounded by VIT intake errors. "Thus, [CMA] cannot succeed on [its] claim that [MRS]'s failure to do so was a breach of its implied warranty of workmanlike performance." Id.

### III. Conclusion

For the reasons stated in detail herein, the Court finds that CMA fails to demonstrate that it is entitled to complete indemnity

54

from MRS because: (1) the parties did not have a contractual relationship, or course of dealing, that expressly or impliedly provided for indemnity; (2) the implied "Ryan indemnity" remedy available in a case where a maritime contractor violates the warranty of workmanlike performance is not applicable in the absence of a "special relationship" between the maritime contractor and a vessel or vessel owner; and (3) even if complete indemnity is an appropriate legal remedy when a shore-based container company violates the warranty of workmanlike performance, CMA fails to demonstrate that the warranty attached in this case, or that any such attached warranty was breached by MRS based on the case-specific evidence presented at trial.

Accordingly, the Clerk is **INSTRUCTED** to enter judgment in favor of MRS. The Clerk is further requested to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**


/s/ _____
Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February 15 , 2019